## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JOHN NOAKES<br>c/o Engel & Martin, LLC<br>4660 Duke Drive, Suite 101<br>Mason, Ohio  45040,<br><br>Plaintiff,<br><br>v.<br><br>BELLARMINE UNIVERSITY<br>2001 Newburg Rd.<br>Louisville, KY 40205,<br><br>Defendant | Case No.   3:18-CV-53-JHM<br><br>Chief Judge Joseph H. McKinley, Jr.<br><br><br>COMPLAINT<br><br>AND<br><br>JURY DEMAND |

### INTRODUCTION

1. Plaintiff John Noakes brings this action for breach of contract and violation of Title IX.

2. John Noakes is a student at Bellarmine University ("Bellarmine"). This case arises out of the decision of Bellarmine to impose disciplinary sanctions against John Noakes in retaliation for his complaints that a Bellarmine faculty member instituted an inappropriate relationship with Noakes, and then sought to punish him when Noakes ended the relationship.

### PARTIES

3. Plaintiff John Noakes is a student at Bellarmine.

    a. John Noakes is a Maryland resident with a residence at [OMITTED].  His driver's license and voter registration is from Maryland. He has traveled to Kentucky for the sole purpose of attending college.

    b. John Noakes has completed enough credits at Bellarmine to obtain his degree, except that there are still some requirements he must fulfill.

1

    c.  John Noakes has paid a significant amount of money to Bellarmine in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

    d.  The disclosure of John Noakes' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.

4.  Defendant Bellarmine is a private university.

    a.  Bellarmine is an independent, private, Catholic school.  Bellarmine has a current enrollment of over 3,800 students.

    b.  Bellarmine has a principal place of business at 2001 Newburg Rd, Louisville, KY 40205.

    c.  Bellarmine voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

5.  This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.  This case is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

7.  The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

8.   This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The

defendant is a resident of the State in which this district is located and a substantial part of the

events or omissions giving rise to the claim occurred in this district.

**FACTS**

9.   This case arises in the midst of the national #MeToo movement.

a.   The #MeToo movement is a national campaign to force institutions and businesses to

confront widespread sexual harassment and assault. Propelled by admiration for those

who have spoken out, fear that what happened to them could happen to others, and anger

at how long abusers have gone unpunished, women and men have come forward to report

instances of sexual harassment, often posting their accounts online using the popular

hashtag.

b.   In late 2017, #MeToo emerged as a trending hashtag on Twitter in the wake of movie

producer Harvey Weinstein's exposure as a serial sexual predator. Since then, victims of

sexual harassment have spoken out in droves, sharing their stories about sexual

harassment.. This national conversation has only grown, implicating many men in

positions of power, across industries.

10.  The #MeToo movement has been prevalent on college and university campuses.

a.   The Chronicle of Higher Education in November 2017 wrote:

Higher education had already had moments of confrontation with harassment, assault,
and the cultural and structural forces that underlie them. . . .  Campus officials have
struggled to determine how to punish abusive employees — and how to avoid simply
passing them on to other universities. Scholarly societies have taken a more vigilant
approach to conferences that have long been seen as incubators for misconduct.  But
the new wave of revelations and accusations has raised the stakes, and the fury the
#MeToo movement has tapped into could have a longstanding impact on higher
education.

b.  USA Today in January 2018 wrote:

Since August, allegations against a small group of high-profile academics and education officials have forced them to step down, in some cases reversing long-standing customs in which universities downplayed such misbehavior, victims' advocates say.

11. Bellarmine has adopted Policy 9.2.7.2, the Discrimination and Sexual Misconduct Policy. (A copy of the Policy 9.2.7.2 is attached to this Complaint is attached as Exhibit A.)

a.  Policy 9.2.7.2 defines "Sexual Misconduct" to include (a) Sexual Exploitation, (b) Sexual Harassment, (c) Non-Consensual Sexual Contact, and (d) Non-Consensual Sexual Intercourse, or Retaliation.

b.  Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

c.  Policy 9.2.7.2 is in addition to the policy set forth in the Student Handbook and states that complaints are to be made in accordance with Policy 9.2.7.3, the Procedure for Resolving Complaints of Discrimination or Sexual Misconduct.  (A copy of Policy 9.2.7.3 is attached as Exhibit B.)

12. The relationship between John Noakes and Bellarmine is governed by the Student Handbook.  (A copy of the Student Handbook is attached as Exhibit B.)

a.  The Student Handbook constitutes a contract between students and the school and, in particular, between John Noakes and Bellarmine.

b.  A copy of the Student Handbook is provided to each student.

13. The Student Handbook also contains a section entitled "Sexual Discrimination & Misconduct Policy" (the "Sexual Misconduct Policy.")

14. The Sexual Misconduct Policy defines Sexual Harassment as "Unwelcome, gender-based verbal or physical conduct that is, sufficiently severe, persistent or pervasive that it, has the effect of unreasonable interference with, denying or limiting someone's ability to participate in or benefit

4

from the University's educational program and/or activities and is based on power differentials (quid pro quo), the creation of a hostile environment, or retaliation.

15. Upon receipt of a complaint that there has been a violation of the policy, Bellarmine has an obligation to begin an investigation. The Sexual Misconduct Policy states: "Once an informal or formal report has been made, a prompt, thorough, and impartial inquiry by the University will occur." This investigation should be interpreted as implementing the requirement under the Title IX Guidance in the Dear Colleague Letter, as part of a "prompt and equitable" resolution process.

16. The Sexual Misconduct Policy provides that the reporting student has, *inter alia*, the following rights:

   a. The right to confer with an "advocate" chosen from the Bellarmine University campus community (student, faculty, or staff member) to help prepare information to present at the hearing. This advocate may be present at the hearing, but may not speak at the hearing or otherwise "represent" the reporting student unless specifically requested to do so by the chairperson of the hearing panel. The Bellarmine rules specifically prohibit this person from being an attorney.

   b. The right to make his or her statement without being in the presence of the responding party in the hearing.

   c. The right to make an "Impact Statement," describing the effect that the incident has had on the reporting party emotionally or physically.

   d. The right to call witnesses (other than character witnesses) to testify at the hearing and to have witnesses (other than character witnesses) submit written statements.

   e. The right to appeal the decision to the Vice President for Student Affairs.

17. The Sexual Misconduct Policy provides for the provision of "accommodations" for those who make allegations that they are victims of sexual assault prior to any determination that sexual

misconduct has occurred.  On information and belief, Bellarmine provides to students who allege that they are victims of sexual misconduct academic accommodations, including changes in grades, assignments, and class schedules, prior to a determination that sexual misconduct has occurred.

18. Allegations of violations of the Code of Conduct are resolved pursuant to the Student Conduct Procedures contained Community Standards and Obligations section of the Student Handbook.

19. The Code of Conduct, on page 36 of the Student Handbook, prohibits a variety of acts, including the following:

    a. "Intentionally or recklessly harassing or causing physical harm to others or causing apprehension of harm. Harassment includes, but is not limited to, stalking, verbal harassment, hate speech, bullying, cyber-bullying, and verbal threats.

    b. "Violation of federal, state, or local laws and ordinances, or University policies including the residence hall contract."

    c. "Conduct which is disorderly, obscene, lewd, indecent, or a breach of peace. This includes, but is not limited to, physical, electronic or verbal misconduct."

20. The Student Conduct Procedures are set forth in the Student Handbook and are used to adjudicate student conduct

21. The Student Handbook at a number of places promises a system that is fundamentally fair.

    a. The Student Handbook on page 35 provides:  "The community conduct process is based on the concepts of fundamental fairness and reasonableness."

> The community conduct process is based on the concepts of fundamental fairness and reasonableness. This community is composed of all students, faculty, and staff members. When a

    b. The Student Handbook on page 36 provides:  "A student who has been charged with a Code of Conduct violation, and thus alleged to be involved in an inappropriate behavior,

will be afforded [certain procedures] to assure fundamental fairness in the student conduct process.

> The Student Conduct Procedures will be used to adjudicate student conduct cases involving alleged violations of the Code of Conduct. Minor deviations in these procedures, including failure to meet stated deadlines which do not significantly prejudice any party, shall not invalidate the procedure. A student who has been charged with a Code of Conduct violation, and thus alleged to be involved in an inappropriate behavior, will be afforded the following to assure fundamental fairness in the student conduct process:

c.   The Student Handbook on page 35 provides, "Provisions made for these proceedings are intended to be fair and thorough . . ."

> respectful of the rights of others, and compatible with the norms of society and the mission of the University. All proceedings of the Bellarmine University community are intended to be educational and are non-adversarial as well as confidential. Provisions made for these proceedings are intended to be fair and thorough but informal at the same time and do not reflect the formalities of either civil or criminal conduct procedures.

22. The Student Conduct Procedures provide that a student who has been charged with a violation is provided with the following:  notice; file access/review; an investigation; a hearing; the ability to call witnesses; the presence of a "supporter;" a written decision; an appeal; and the maintenance of records.  These rights are detailed below:

a.   <u>Notice.</u>  Under the Student Conduct Procedures, an accused student is entitled "to be informed in writing of the specific violation in which the student was allegedly involved."

b.   <u>File Access/Review.</u>  Under the Student Conduct procedures an accused student "has the right to review official documents in his/her student conduct file." Bellarmine restricts

access to the files by requiring the accused student to make an appointment with the Dean of Students to review the files at an office, and prohibits the copying of any documents or the removal of any documents.

c. <u>Investigation</u>.  Under the Student Conduct Procedures, a hearing should not be scheduled until "a charge has been filed and investigated . . ."

d. <u>Hearing.</u>  Under the Student Conduct Procedures, an accused student has the right to a "fair and impartial hearing."  The rules further provide that the "case will be heard in a fair manner."  Rules for the hearing include the following:

    i. An accused student is permitted "to respond to the information, to present information, and to include relevant witnesses, during a fair and impartial hearing."

    ii. The hearing is described as a "private, internal review process" where "criminal law concepts" and the rules of evidence do not apply.

    iii. The standard of proof at the hearing is "the preponderance of the evidence; which means that the information presented, as a whole, shows that the occurrence of the alleged behavior was more probable than not."

    iv. Conduct Panels are composed of one chief hearing officer, one faculty member and one staff member.

    v. Private attorneys may not be present at the hearing.

    vi. The reporting student and the accused student are "given the opportunity to indirectly question each other and all witnesses through the hearing officer(s) during the proceedings."

    vii. Hearings may be extended or continued "based on good cause (i.e., illness or reasonable delays)."

e. <u>Witnesses</u>.  Under the Student Code of Conduct an accused student has the right to "have witnesses speak or present material relevant to the case."  An accused student bears the "responsibility. . . to notify the witnesses of the hearing." and to provide a list of the witnesses

f. <u>Supporter</u>.  Under the Student Code of Conduct an accused student may have an "advisor" or "supporter" present.  This advisor must be a Bellarmine University faculty member, staff member or student.  The advisor or supporter may attend the hearing but who is not permitted to speak.  The Handbook explains, "The role of the supporter is simply to lend emotional and personal support to the student involved in the student conduct process."

g. <u>Written Decision</u>.  Under the Student Code of Conduct an accused student is entitled to receive written notification of the findings of the hearing and the sanctions imposed.

h. <u>Appeal.</u>  Under the Student Code of Conduct, an accused student may appeal an adverse decision resulting in suspension or dismissal from the University or residence halls.

    i. Appeals are limited to three specific grounds:  the sanction was disproportionate to the offense committed; new information that was not known at the time of the original hearing is available; or the hearing did not conform to the procedures outlined in the Student Code of Conduct.

    ii. Appeals of University suspension or dismissal are heard by the Committee on Student Appeals. This committee is composed of two students appointed by the Student Government Association, one faculty member and two administrators.

23. Bellarmine's restrictions on the students choice of advisors or support person in cases involving sexual misconduct is in violation of the requirements of the Clery Act.  20 U.S.C. § 1092(f) (1990), with implementing regulations in the Federal Registrar 34 C.F.R. 668.46.

9

   a. As of July 1, 2015, the Clery Act requires Bellarmine to permit complainants and respondents to be accompanied by an advisor of choice in meetings and proceedings related to the investigation and adjudication of allegations of sexual violence, dating violence, domestic violence, and stalking. Bellarmine is not permitted, under the Clery Act, from limiting the choice of advisor or barring the presence of an advisor.

   b. The Clery Act provides: "the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice" 20 U.S.C.S. 1092(f)(8)(B)(iv)(II).

24. Bellarmine's investigative and adjudicative process violates the Clery Act in other respects. The Clery Act requires that Bellarmine have disciplinary proceedings for allegations for sexual misconduct that are prompt, fair, and impartial. 20 U.S.C .S. 1092(f)(8)(B)(iv)(I). This includes, the following requirements under 34 C.F.R. 668.46(k)(3)(i)(C):

   a. Proceedings must be completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause

   b. An accused student must be given timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings

   c. Proceedings must be conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused.

25. Bellarmine has a duty under the accreditation standards to provide a disciplinary process that consistent with the liberal values of fairness and due process.

   a. Accreditation standards applied to the colleges and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and

that an institution's educational policies and procedures are equitably applied to all its students.

b.  Bellarmine is accredited by the Southern Association of Colleges and Schools, Commission on Colleges. The accreditation standards applied to the school, in Section 1.1, require that Bellarmine operate "with integrity in all matters."

26. The Student Code of Conduct applies to behavior both on and off-campus.  The policy states that it applies to "all university-related travel and study abroad experiences. . ."

## THE SEXUAL HARASSMENT OF JOHN NOAKES AND THE RETALIATORY DISCIPLINARY PROCEEDINGS

27. Dr. Barrios taught chemistry at Bellarmine.

28. During the summer of 2017, Dr. Barrios agreed to serve as a research advisor for John Noakes. Previously, John Noakes had been a student in Dr. Barrios' organic chemistry class.

29. In the spring of 2017, Dr. Barrios' dog died.  He reached out to John Noakes, describing John Noakes as one of his few friends.

30. During the spring and summer of 2017, Dr. Barrios and John Noakes engaged in an inappropriate relationship.  This inappropriate relationship included meetings off campus, including at Dr. Barrios' apartment.  Dr. Barrios would engage in sexually explicit discussions, both in person and by text messages, of his personal sexual history and opinions.  Dr. Barrios used explicit language and several of his remarks were directed specifically towards John Noakes.

a.  In various text messages during the summer of 2017, Dr. Barrios stated he took their friendship "seriously" and di not wish for the relationship to end.

b.  In a November 9, 2017 statement to the school, Dr. Barrios, admitted that his relationship with John Noakes was "inappropriate."  He wrote:

I have acknowledged that in reflecting on our friendship and text banter, although joking in nature – as [John Noakes] and I both confirm – they do read poorly and as

11

inappropriate. This has been a learning experience for me in terms of the need to set better boundaries with my students.

31. The relationship extended to work on campus and in the laboratory where John Noakes was working on his research projects. Dr. Barrios would act possessive of John Noakes while John Noakes was working in the laboratory. If John Noakes did not do exactly as Dr. Barrios wanted, went to lunch with other people, or discussed hanging out with other people, Dr. Barrios would get angry at John Noakes and criticize his work.

32. Dr. Barrios denied that there was a sexual relationship between him and John Noakes. However, a number of text messages between the parties contained sexually explicit content. These texts suggest that Dr. Barrios sought a sexual relationship with John Noakes.

    a. On June 2, 2017 John Noakes refers to Dr. Barrios as "hot stuff." Dr. Barrios responded, "I'm waiting for you."

    b. On June 14, 2017, the two exchanged a series of sexually explicit text messages. Dr. Barrios said that his "dick has spider webs." Dr. Barrios later said that John Noakes' hair "looks sexy as fuck."

    c. On June 15, 2017, John Noakes texted Dr. Barrios that he as "tons of sex with guys." Dr. Barrios responded, ". . . you have tons of sex but with one guy."

    d. On June 16, 2017 John Noakes texted about a girl he thought was cute. Dr. Barrios responded with a series of sexually explicit texts, including saying to John Noakes, "Remember don't make it last more than 12 minutes. The rule says that anything below 12 minutes is having, anything about 12 minutes is making love." Later that day, Dr. Barrios texted to John Noakes that he was in the shower "drinking a mix of come and Captain Morgan." As short while later, he texted, "Dude with come is the perfect combination and flavor."

    e.   On June 18, 2017, John Noakes and Dr. Barrios exchanged text messages about women's breasts and penises.

33. Dr. Barrios invited John Noakes over to Dr. Barrios' apartment on a number of occasions.  Dr. Barrios used these visits to attempt to initiate a sexual relationship with John Noakes.  Dr. Barrios attempted to touch John Noakes' penis or engaged in sexual activity with John Noakes on a number of occasions.

    a.   On June 17, 2017 John Noakes went to Dr. Barrios' apartment.  Dr. Barrios texted to John Noakes the next day, "Thanks for stopping by.  I'm sure it wont; be your last."  The next day, John Noakes texted to Dr. Barrios, "Thanks again for last night (wink)."  Dr. Barrios responded, in part, "I'm sure it won't be your last time."  A few hours later, the two exchanged the message, "chupame el pene" which is Spanish for "suck my dick."

    b.   On June 19, 2017, John Noakes slept in Dr. Barrios' bed.  Text messages confirm this interaction.  John Noakes refers to a "hole" in the mattress and Dr. Barrios states that his "bed smells like" John Noakes.

    c.   On June 21, 2017, John Noakes sent a text to Dr. Barrios stating that he enjoys friendships "where they accidently touch my pp."  Dr. Barrios responded, "Accidently?"

    d.   On June 23, 2017, John Noakes sent a text to Dr. Barrios stating "stop trying to touch my pp."  Dr. Barrios responded, "Go study.  And I haven't try [sic] yet."  John Noakes responded, "stop tryin to undress me everywhere."

    e.   On July 1, 2017, John Noakes texted to Dr. Barrios, "Do you feel what I left you?"  Dr. Barrios responded, "You are talking about the smell on my bed, right?"

    f.   On July 5, 2017, Dr. Barrio shad texted John Noakes, "Do you have those blue red and white undies ready for tomorrow?"  After the incident, John Noakes sent a text to Dr. Barrios stating ". . . sounds like you are trying to touch my balls."

13

34. On or about June 14, 2017, John Noakes and Dr. Barrios had a disagreement about John Noakes lab schedule.  John Noakes referred to Dr. Barrios as a "dick" and asked that Dr. Barrios not contact him again.  Dr. Barrios responded that that he "took their friendship seriously" and did not want the relationship to end.  The two resolved the dispute and engaged in inappropriate and sexual banter.

35. Although John Noakes was uncomfortable with the relationship starting in the middle of June 2017, he did not take any actions to end the relationship because he feared retaliation from Dr. Barrios.

   a.  John Noakes was doing research under Dr. Barrios and feared that ending the relationship would affect his grades.

   b.  John Noakes needed a letter of recommendation from Dr. Barrios and other faculty members and feared that ending the relationship would result in him not receiving a favorable recommendation for medical school.

36. In July 2017, John Noakes and Dr. Barrios discussed maintaining their relationship after John Noakes graduated and went to medical school.  Dr. Barrios discussed his ability to transfer to another institution and concluded, "I guess I will be moving in 2 years."

37. John Noakes developed a proposal for an independent study project under Dr. Barrios' supervision.  John Noakes planned to work on the project during the summer and fall of 2017 to aid his anticipated application to medical school.  The project would take place as an independent study course at Bellarmine, for which John Noakes would receive credit upon approval by Dr. Barrios.

38. In August 2017, after John Noakes had indicated that he did not wish to continue the inappropriate relationship with Dr. Barrios, Dr. Barrios attempted to remove John Noakes from the research project.

a. On or about August 28, 2017, Dr. Barrios informed John Noakes that Dr. Barrios would be adding another person to the research project. This was part of an effort to reduce John Noakes' role so that Dr. Barrios could claim the results of the research project for himself.

b. When John Noakes objected to the new arrangement, John Noakes was removed from the research project.

c. Dr. Barrios stated that the research project "belonged to" him and that he could assign or re-assign any student he wished to the project. Dr. Pat Holt, the Department chair, became aware of the situation and supported Dr. Barrios. John Noakes was told that he had to withdraw from the research project course since Dr. Barrios did not wish to work with him anymore.

39. On or about September 6, 2017 John Noakes and Dr. Barrios had a disagreement that resulted in the end of the relationship.

a. John Noakes was supposed to spend a minimum of three hours in the lab each week working on his project in order to receive credit from Bellarmine. John Noakes often spent extra time in the lab.

b. John Noakes proposed to Dr. Barrios, in his role as a faculty member of the Honors Committee, that he be permitted to fulfill his foreign language requirement by taking courses during a study abroad program the following summer. Dr. Barrios became angry and accused John Noakes of attempting to "double dip" – meaning fulfilling two requirements through one class.

40. Dr. Barrios made a false allegation that John Noakes had threatened him. This fabricated allegation was in direct response to John Noakes seeking to end their relationship and was part of a plan to intimidate John Noakes from reporting the inappropriate relation to Bellarmine.

a. On September 6, 2017 Dr. Barrios had sent an email to John Noakes stating:

> After today's incident in my office, I'm honestly not sure if I feel comfortable being the research advisor of a student who has threatened to get me fired. I don't think your conduct was acceptable in my office, especially when you called me names in front of another student.

This email was an effort to create a "record" of false allegations – John Noakes never threatened Dr. Barrios.

b. On September 7, 2017, Dr. Barrios met with Dr. Holt, his Department Chair, and falsely claimed that John Noakes had become upset when Dr. Barrios refused to support his request to count a study abroad experience towards the school's foreign language requirement. Dr. Barrios claimed that John Noakes had become enraged and threatened to kill him.

c. The falseness of the allegation is confirmed by the lack of any effort taken by Bellarmine to "control" this threat. Bellarmine, Dr. Barrios, and Dr. Holt did not take any actions which would normally be expected of a school in the face of a threat of violence, such as isolating John Noakes or contacting law enforcement.

41. On September 13, 2017, John Noakes met with Dr. Holt.

a. An earlier meeting had been cancelled because Dr. Barrios claimed he did not feel safe being in the same room as John Noakes. Yet, again, Dr. Holt and Dr. Barrios did not contact law enforcement or take any other actions consistent with a belief that a threat had, in fact, occurred.

b. Dr. Holt informed John Noakes of the allegation that John Noakes had threatened Dr. Barrios. John Noakes was surprised by the claims. Dr. Holt appeared to believe the claims by Dr. Barrios without conducting any investigation or, even, inquiring of John Noakes about whether the allegations were true.

16

c. Dr. Holt informed John Noakes that John Noakes would be required to withdraw from the research project and receive a "W" on his transcript. Dr. Holt wanted John Noakes to send an "apology" email to Dr. Barrios; he said that an "apology letter would make this go away."

42. John Noakes refused to apologize for something he did not do and, further, refused to relinquish his role in his research project.

43. On September 26, 2017, John Noakes received notice that he was being charged with a violation of the Code of Student Conduct for the alleged incident on September 6, 2017.

a. The Notice of the alleged misconduct is set forth here:

**Bellarmine University**
**Notice of Alleged Violation(s)**

| | | | |
|---|---|---|---|
| Student's Name: | ████████ | ID Number: | ████████ |
| Date of Incident: | 9/6/17 | Time: | afternoon |
| Place: | Research Lab and Faculty Office | | |

████ allegedly verbally harassed a Bellarmine University faculty member in the faculty member's office with threats of physical harm.

Alleged Violation(s) Checked Below:

| Student Code of Conduct | Residence Life Community Standards |
|---|---|
| ☐ 1.00 Academic Dishonesty | ☐ (a) Alcohol |
| ☑ 2.00 Harassment | ☐ (b) Appliances |
| ☐ 3.00 Interfering with University Functions | ☐ (c) Bicycles |
| ☑ 4.00 Violation of Federal, State, Local Law and/or University Policies | ☐ (d) Building Safety |
| | ☐ (e) Bunk/Loft Beds |
| ☐ 5.00 Theft | ☐ (f) Confiscation |

b. The Notice did not describe exactly what John Noakes had done to violate the Code of Conduct. Specifically, a the Notice says only that John Noakes violated "Federal, State,

Local Law and/or University Policies" in general terms without indicating which law or policy was actually violated.

c. The Notice stated that a hearing on the claims against John Noakes had been scheduled for October 11, 2017.

44. On October 9, 2017, John Noakes submitted a formal complaint against Dr. Barrios under the Bellarmine Sexual Misconduct Policy.

45. Bellarmine agreed to postpone to October 11, 2017 disciplinary hearing so that the school could conduct an investigation of John Noakes' claims against Dr. Barrios. Bellarmine did not give John Noakes credit for his research project, but permitted the removal of any reference to the project from John Noakes' transcript.

46. Bellarmine had a couple of professors conduct an investigation into John Noakes' claim. These professors gathered some information and issued a Report (A redacted copy of the Report is attached as Exhibit C.)

47. The Report was an obvious and clumsy effort designed to cover up the conduct of Dr. Barrios and shift blame for the inappropriate relationship to John Noakes. This is demonstrated by the focus of the investigators on the issue of whether John Noakes "consented" to the relationship with Dr. Barrios despite the obvious power imbalance between a professor and a student.

a. The Report concludes the evidence "appears to demonstrate a consensual sexual relationship between the two parties." On page 7, the Report states "It is difficult to interpret" the interactions between Dr. Barrios and John Noakes as sexual harassment because the sexual comments from Dr. Barrios are "often countered with a sexual comment from" John Noakes. At another point, the Report states "they continue to choose to be together, and we do not see evidence of sexual harassment" as a result.

b.  The Report ignored Bellarmine policies and the Faculty Handbook which clearly prohibit this type of relationship.  Under the terms of Bellarmine's policies, sexual misconduct includes a number of activities that constitute harassment yet do not involve non-consensual sexual relationship. The Bellarmine faculty handbook – which the report does not address – specifically prohibits not just non-consensual relationship between faculty and students but also "inappropriate" conduct by faculty. The Handbook (page 55) provides:

> Inappropriate conduct by University personnel toward students, faculty and staff members is prohibited, and University policies shall identify procedures for identifying and responding to inappropriate conduct by University personnel

(Available at: https://www.bellarmine.edu/docs/default-source/hr-docs/Faculty_Handbook.pdf)

c.  The Report, at a number of places, failed to recognize that "sexual harassment" includes the exploitation of a powerful position to impose sexual demands or pressures on an unwilling but less powerful person. The report improperly excuses the actions of Dr. Barrios, at a number of places, by blaming John Noakes.  For example, n Page 9, the report provides:

> We do agree that Dr. Barrios is a "person of power" since [John Noakes] is a student and these are inappropriate and sexual comments. However, it is difficult to see how [John Noakes] is a victim when he joins in the banter, initiates sexual comments, continues to go out to eat with Dr. Barrios, continues his research with Dr. Barrios, and even visits Dr. Barrios' residence at night.

d.  The Report perpetuated an antiquated view of sexual harassment by blaming John Noakes for not reporting the sexual harassment. As a victim of sexual harassment, John Noakes had valid reasons to not report the inappropriate conduct by Dr. Barrios.

    i.  John Noakes believed that Bellarmine would not take the complaint seriously and would cover up the behavior of a faculty member in order to avoid possible liability of public embarrassment.

    ii.  John Noakes believed that he would be the subject of retaliation from faculty members and/or the Bellarmine administration for making an allegation of misconduct against a faculty member.

48. John Noakes' concern about a cover-up was confirmed by the efforts of Bellarmine to prevent the disclosure of the Report. Nothing in the law or the Bellarmine rules prohibits John Noakes from disclosing the report. (*Bellarmine* may be prohibited by FERPA from disclosing the report; FERPA does apply to or limit students like John Noakes.) Yet, Bellarmine initially refused to provide John Noakes with a copy of the Report unless he agreed to a broad non-disclosure agreement that would prohibit John Noakes from discussing publicly any aspect of Dr. Barrios' conduct. Bellarmine only agreed to provide a copy of the Report when John Noakes refused to sign the proposed non-disclosure agreement.

49. On December 21, 2017, Bellarmine's counsel informed John Noakes that the school had scheduled a hearing on his Title IX claims for January 12, 2018. Although Bellarmine was aware that John Noakes had significant problems with the Report, the school scheduled the hearing without receiving the details of these concerns. Bellarmine scheduled the hearing without consulting John Noakes or his counsel in order to ascertain their availability on the hearing date.

50. On December 22, 2017, John Noakes, though his counsel, provided objections to the Report and suggested numerous areas of further inquiry.

51. In response, on December 27, 2017, Bellarmine agreed to conduct some additional investigative work, but suggested it could be completed in time for the hearing. The general tone of Bellarmine's response was dismissive.

    a.   Bellarmine made open-ended and general requests that John Noakes provide information, ignoring the responsibility of investigators to make reasonable affirmative efforts to obtain relevant information from various sources.

    b.   Bellarmine, through its counsel, maintained a hostile position towards John Noakes' claims.  For example, in its December 22, 2017 correspondence, Bellarmine's counsel described John Noakes' efforts to obtain a full, fair, and equitable resolution of his claims as "some sort of posturing effort designed to try to avoid addressing an issue now just so you can raise it later as a courthouse."  Bellarmine then accused John Noakes of acting in "bad faith" and threatening to "deal with it as such."

    c.   Bellarmine, through the December 27, 2017 correspondence and otherwise, attempted to bully John Noakes into waiving his right to a full, fair, and equitable investigation. Bellarmine did this by imposing arbitrary deadlines and suggesting that the failure to comply with these demands would result in the waiver of claims.  Bellarmine also sought to impose on John Noakes the obligation to obtain information which is not in the his custody, control or knowledge.

52. Between December 27 through December 29, 2017, Dr. Barrios left his position as a faculty member at Bellarmine.

53. On December 30, 2017, Bellarmine informed John Noakes that Dr. Barrios would "not be returning to Bellarmine as a faculty member."

54. On December 30, 2017 – almost immediately after Dr. Barrios' departure -- Bellarmine undertook a series of steps and actions in direct retaliation for John Noakes' making a complaint that led to the departure of a faculty member and that threatened to embarrass the institution.

    a.   Bellarmine did not wait until John Noakes returned to school.  Instead, it sent an email to John Noakes' counsel during winter break.

b. Even though Dr. Barrios is no longer employed by Bellarmine, Bellarmine informed John Noakes that it still intends to continue with a hearing on John Noakes claims of sexual harassment. On information and belief, Bellarmine is seeking to have a hearing on John Noakes claims as part of a pattern of harassment and retaliation. The purpose of the hearing is to determine if Dr. Barrios violated the Bellarmine polices against sexual harassment. But, since Dr. Barrios is no longer employed by the school the hearing is a formality deigned only to impose additional costs and burdens on John Noakes.

c. Bellarmine, through its counsel, informed John Noakes that he would be facing a new disciplinary hearing on an expedited schedule.

    i. Bellarmine informed John Noakes that he would face discipline not only for the original complaint brought by Dr. Barrios, but also for alleged misconduct based on statements made by John Noakes in text messages turned over by John Noakes to the investigators of his Title IX claim.

    ii. Bellarmine's counsel provided the following notice of the claims to John Noakes' counsel:

First, he is being charged in connection with the incident that occurred in Dr. Barrios' office on September 6, 2017. This is the same violation presented to ▮▮▮▮ last September. Additionally, the hearing will also address alleged threats made by ▮▮▮▮ toward Dr. Mahmood on June 2, 2017 and July 3, 2017. As you may know, the existence of these threats came to our attention during the course of the investigation associated with the sexual misconduct hearing, and our review of the report and the totality of the circumstances surrounding ▮▮▮▮ conduct as a student has led to the conclusion that his conduct as set forth in the text messages from last summer should be addressed in the student code hearing.

These alleged violations are associated with following provisions of Bellarmine's Code of Student Conduct:

> 2. Intentionally or recklessly harassing or causing physical harm to others or causing apprehension of harm. Harassment includes, but is not limited to, stalking, verbal harassment, hate speech, bullying, cyber-bullying, and verbal threats.
>
> 4. Violation of federal, state, or local laws and ordinances, or University policies including the residence hall contract.
>
> 13. Conduct which is disorderly, obscene, lewd, indecent, or a breach of peace. This includes, but is not limited to, physical, electronic or verbal misconduct.

As is normally the case, the student code hearing will be conducted by Bellarmine staff members. You and ▮▮▮▮ can obtain additional information about the hearing process and possible sanctions on pages 36-39 of the Student Handbook.

iii. The new charges of misconduct against John Noakes were based on alleged threats against another faculty member – Dr. Mahmoud – discovered in text messages between John Noakes and Dr. Barrios. These messages were from July 2017 and were of a joking nature. They were not taken seriously by either Dr. Barrios when they were received or the investigators when they reviewed the messages; nobody even informed Dr. Mahmoud about the messages. The text messages cannot form the basis for any violation. Dr. Mahmoud was not aware of the messages, so John Noakes could not have harassed Dr. Mahmoud or caused him "apprehension of harm" as would be required to violated the Code of Conduct. Nor do the messages violate any law or constitute "disorderly, obscene, lewd, indecent or a breach of the peace."

      iv.  Bellarmine, like most schools, usually provides amnesty for students for information about alleged misconduct found during investigations into Title IX allegations. This is done to avoid discouraging students from reporting serious misconduct such as sexual harassment out of fear of disclosing other, minor, violations. John Noakes requested such amnesty. Bellarmine, however, refused to provide amnesty to John Noakes in this situation.

    d.  Bellarmine, through its counsel, informed John Noakes that he would be removed from his position as a resident advisor prior to any hearing. This resulted in John Noakes losing room and board as well as a monthly stipend for his work. This also required John Noakes to re-locate to a different room hours before the start of classes for the spring semester.

55. The expedited disciplinary proceeding was a sham proceedings designed to reach a pre-determined outcome.

    a.  Although the matter, ultimately, involved a matter related to a claim of sexual harassment, Bellarmines refused to allow John Noakes to be accompanied by an attorney, as required by the Clery Act.

    b.  Bellarmine provided John Noakes with an opportunity to review his "file" prior to the expedited disciplinary hearing. The file was not an investigation, but merely six pages of notes and documents compiled by the Dean of Students and did not show that Bellarmine had conducted anything but a cursory investigation into the allegations against John Noakes. Bellarmine would not provide John Noakes with copies of the evidence it proposed to use against him but, instead said that he could only review the information in the Dean's Office prior to the hearing.

    c.  Bellarmine sought to discourage John Noakes from presenting witnesses at his hearing.

    i. Prior to the hearing John Noakes, as required by the Code of Conduct, provided Bellarmine with a list of his potential witnesses.  Bellarmine staff insisted that John Noakes provide summaries of anticipated testimony even though this is not required by the rules.

    ii. Bellarmine threatened to exclude the presence of obviously relevant witnesses.  For example, John Noakes sought to have Dr. Mahmoud testify at the hearing because he was the alleged victim of the text message threats from John Noakes.  Amazingly, Bellarmine's counsel wrote, "We do not believe that Dr. Mahmood has any knowledge about any of these matters, and we will, therefore, object to attempts to have him testify."

56. Bellarmine held a hearing on January 9, 2017 on the allegations against John Noakes.

    a. The panel members indicated that the purpose of the hearing was to teach John Noakes "a lesson."

    b. The Dean of Students acted in a number of ways to assure that John Noakes would be found responsible.  The Dean of Students selectively redacted portions of the text messages allegedly sent by John Noakes.  The Dean of Students also constructed a "timeline" of events that was provided to the panel members.

    c. Dr. Barrios, although a key witness, did not appear at the hearing.

    d. Bellarmine presented a statement/testimony from an alleged third party witness.  On information and belief, Bellarmine and the Dean of Students coerced or encouraged this witness to provide false testimony.

        i. This witness had previously told John Noakes that she "didn't want to get involved" and had told John Noakes that he had not made any threatening or improper statements.

        ii.   The Dean of Students coached the witness on how to structure her statement and on what information to include prior to the hearing.

        iii.   This student confirmed at the hearing that she was seeking a recommendation from Dr. Barrios.

57. John Noakes was found responsible and placed on probation.

    a.   As a result of being on probation, John Noakes is considered to not be in "good standing" with the school and is unable to participate in a pre-paid and non-refundable study abroad course.

    b.   John Noakes will be require to disclose on his applications to professional school and any licensing authorities that he was subject to discipline at his school.

58. The Defendants' continued actions against John Noakes are causing substantial, immediate, and continuing damages. Discipline by Bellarmine has caused John Noakes to be denied aspects of the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. John Noakes may also lose eligibility for a valuable scholarship, which will make attendance at his chosen school significantly more difficult.

## COUNT I
## (BREACH OF CONTRACT)

59. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

60. By enrolling at Bellarmine, paying his tuition and fees, and attending the school, John Noakes and Bellarmine had a relationship that may reasonably be construed as being contractual in nature.

61. The terms of the contract between Noakes and Bellarmine are generally found in various College policies and procedures, including those set forth in the Student Handbook attached as Exhibit B.

62. The contract between John Noakes and Bellarmine required Bellarmine to provide John Noakes with an adjudicatory process that was "fair and thorough."  The Student Handbook states, "The

26

community conduct process is based on the concepts of fundamental fairness and reasonableness."

63. The contract between John Noakes and Bellarmine contains an implied covenant of good faith and fair dealing. This implied covenant prohibits Bellarmine from doing anything which will have the effect of destroying or injuring the right of John Noakes to receive the fruits of the contract. The covenant imposes upon Bellarmine the duty to act in a "bona fide" manner, meaning with good faith, honestly, openly, and sincerely; without deceit or fraud.

64. John Noakes paid Bellarmine tuition and fees for the 2017-2018 school year.

65. Bellarmine repeatedly and materially breached the explicit guarantee of essential fairness and as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

   a. Bellarmine imposed discipline on John Noakes without providing him with sufficient notice.

      i. The Student Conduct Procedures provide that an accused student is entitled "to be informed in writing of the specific violation in which the student was allegedly involved." In addition to a breach of this specific provision, the failure to provide adequate notice was a breach of the guarantee of fundamental fairness, and the implied covenant of good faith and fair dealing.

      ii. John Noakes was only told that he had committed some vague violations; he was never informed of the precise nature of his misconduct. John Noakes was alleged to have violated the Code of Conduct by "causing apprehension of harm," yet Bellarmine never identified the actual person who had such apprehension. Similarly, John Noakes was alleged to have violated "federal, state, or local laws," yet Bellarmine failed to identify which actual laws were violated.

27

b.  Bellarmine imposed discipline on John Noakes without providing him with reasonable access to the investigative report and other materials to be used against him.

    i.  The Student Code of Conduct provides that John Noakes "has the right to review official documents in his/her student conduct file."   In addition to a breach of this specific provision, the failure to provide adequate access to the file was a breach of the guarantee of fundamental fairness, and the implied covenant of good faith and fair dealing.

    ii.  Bellarmine breached this promise by not providing reasonable access.  John Noakes was not permitted to have a copy of the investigative report or other evidence so that he could prepare adequately.  Bellarmine made the file available for review only at inconvenient locations and times and did not provide John Noakes with adequate privacy.

c.  Bellarmine imposed discipline on John Noakes without conducting an adequate investigation.

    i.  The Student Conduct Procedures assume that Bellarmine will conduct a full and timely investigation of the complaint. In addition to a breach of this specific provision, the failure to conduct a full and fair investigation was a breach of the guarantee of fundamental fairness, and the implied covenant of good faith and fair dealing.

    ii.  Bellarmine undertook only a cursory investigation and failed to interview a number of important witnesses, including the alleged victim.

d.  Bellarmine imposed discipline on John Noakes without conducting a fair hearing.

    i.  The Student Conduct Procedures provide that  an accused student has the right to a "fair and impartial hearing."  The rules further provide that the "case will be

heard in a fair manner." In addition to a breach of this specific provision, the failure to provide a fair hearing was a breach of the guarantee of fundamental fairness, and the implied covenant of good faith and fair dealing.

ii. The conduct of entire process treated John Noakes as if he was guilty from the start, thereby tainting the hearing process. Bellarmine administrators and investigators acted from the beginning as advocates who "believed" the allegations without conducting any investigation. The bias of the entire process was so pervasive throughout the pre-hearing and hearing processes that it destroyed any possibility of fairness and ensured that John would be found guilty. The finding was plainly a product of the presumption of guilt.

66. As a direct and foreseeable result of the University's failure to honor its express and implied contractual promises and representations, John Noakes has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT II
## (PROMISSORY ESTOPPEL)

67. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

68. This Count is asserted against Bellarmine.

69. As described above, the Student Handbook and other official College publications constitute promises and representations that Bellarmine intended to induce reliance on the part of John Noakes. In reasonable reliance, John accepted Bellarmine's offer of admission and incurred the cost of tuition and related expenses based on Bellarmine's representations that it would honor its express and implied promises, including the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

29

70. John Noakes relied to his detriment on these express and implied promises and representations made by Bellarmine, including that Bellarmine would comply with all applicable federal laws and regulations.

71. Injustice can only be avoided by enforcement of Bellarmine's promises and representations, including the representation that Bellarmine would comply with all applicable federal laws and regulations.

72. As a direct and foreseeable result of the University's failure to honor its promises and representations, John Noakes has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT III
### (NEGLIGENCE)

73. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

74. This Count is asserted against Bellarmine.

75. Having put in place a student disciplinary process, Bellarmine owed a duty of care to John Noakes and others to conduct that process in a non-negligent manner and with due care. Bellarmine officials who directed and implemented that process owed John Noakes the same duty of care. Bellarmine is responsible for the conduct of those acting on its behalf under the theory of *respondiat superior*.

76. Negligence in this case is defined as a process that is "fair and ethical."

   a. This duty is imposed by the contractual and/or quasi-contractual relationship between the parties.

   b. This duty is further imposed by applicable accreditation standards and the role of Bellarmine in providing an education consistent with the liberal values of fairness and due

process.   Accreditation standards applied to the colleges and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and that an institution's educational policies and procedures are equitably applied to all its students.

77. The conduct of Bellarmine in holding a hearing fell below the applicable standard of care and amounted to breaches of the duty of due care.  As described above, Bellarmine used a biased process and hearing panel.

78. As a direct and proximate result of Bellarmine's negligence, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

79. The Defendants are liable to John Noakes for damages.

## COUNT IV
## (VIOLATION OF TITLE IX – SEXUAL HARASSMENT)

80. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

81. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

82. Defendant Bellarmine is an education program or activity operated by recipients of Federal financial assistance.

31

83. Dr. Barrios' conduct was unwelcome and of a sexual nature and had the effect of interfering with John Noakes' ability to participate in or benefit from school programs.

84. Dr. Barrios had authority to assign, review, and grade John Noakes' work; in addition, he might be called upon to provide career counseling or an employment recommendation. Thus, Dr. Barrios was in a position to have a significant effect on John Noakes' academic and professional success.

85. Dr. Barrios capitalized upon his authority as a professor to further his harassment of John Noakes. Through the use of research assignments and the threat of discipline against John Noakes, Dr. Barrios exploited his position of authority to create an opportunity to subject John Noakes to sexual harassment.

86. Bellarmine is liable for the actions of Dr. Barrios because he had a supervisory relationship over John Noakes and the professor capitalized upon that supervisory relationship to further the harassment of John Noakes. Dr. Barrios was acting as Bellarmine' agent in his role of college professor. That role furthered Bellarmine's goal of attracting students to the Bellarmine and placed Dr. Barrios in a position of authority vis a vis his  John Noakes. His blatant abuse of that authority is sufficient under agency principles to impute liability to Bellarmine.

87. Bellarmine is liable because it provided no reasonable avenue for complaint by John Noakes. Although Bellarmine maintains a sexual harassment policy, the mere existence of reasonable complaint procedures does not insulate Bellarmine from liability for sexual harassment claims. John Noakes invoked the internal grievance procedures, but Bellarmine failed to respond to their complaints in a timely fashion and, instead, undertook a sham investigation and ultimately retaliated against John Noakes for raising these claims.

88. Bellarmine is liable because it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.  Bellarmine had, at a minimum,

constructive notice of Dr. Barrios' harassment because it was pervasive. The investigators and administrators failed to interview many persons likely to possess relevant information such as third parties who may have observed the relationship between John Noakes and Dr. Barrios. On information and belief, it is highly unlikely that a student and a professor at a relatively small institution like Bellarmine would have this type of relationship without the knowledge of other faculty or students.

89. As a direct and proximate result of Bellarmine's violations of John Noakes rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

90. Bellarmine is liable to John Noakes for his damages.

91. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT V
## (VIOLATION OF TITLE IX – RETALIATION)

92. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

93. John Noakes engaged in protected activity by making an allegation of sexual harassment against Dr. Barrios, a Bellarmine faculty member.

94. John Noakes' exercise of that protected activity was known to Bellarmine administrators.

95. John Noakes was subjected to an adverse educational action subsequent to or contemporaneous with the protected activity.   In particular, immediately after Dr. Barrios left the Institution, Bellarmine sought to impose the following adverse actions against John Noakes:

a. John Noakes was subjected to a disciplinary hearing on an expedited schedule. This disciplinary proceeding was a sham proceeding and resulted in John Noakes being found responsible and placed on probation.

   i. The original charges against John Noakes were fabricated charges and a part of a pattern of sexual harassment by Dr. Barrios.

   ii. The new charges against John Noakes was based evidence of alleged misconduct discovered during the investigation into John Noakes' claims and provided voluntarily by John Noakes. On information and belief, in most instances Bellarmine provides amnesty for students who acknowledge minor misconduct during the course of a more serious sexual harassment investigation in order to prevent a chilling effect on complaints.

b. John Noakes was removed from his position as a resident advisor, resulting in his loss of employment, room, and board.

96. The adverse actions against John Noakes were directly related to his assertion of a sexual harassment complaint against a Bellarmine faculty member and were deigned to punish and intimidate John Noakes from public disclosing the misconduct by Dr. Barrios. The fact that Bellarmine imposed additional adverse actions against John Noakes shortly after Dr. Barrios left

97. As a direct and proximate result of Bellarmine's violations of John Noakes rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

98. Bellarmine is liable to John Noakes for his damages.

99. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

**Wherefore**, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Noakes awarding damages in an amount to be determined at trial but reasonably believed to be in excess of $1,000,000.00;
- An Injunction restoring John Noakes as a student in good standing, vacating the findings of responsibility, and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties or Title IX.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

_____/s/ Jeffrey Shipp_____
Jeffrey C. Shipp
WALLACE BOGGS, PLLC
300 Buttermilk Pike, Suite 100
Ft. Mitchell, Kentucky 41017
(859) 341-4366
jshipp@wallaceboggs.com

Joshua Adam Engel (0075769)
Anne Tamashasky (0064393)
     *pro hac vice motions to be filed*
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com